**Debra Jean LEMASTER, a minor, et al., Appellants,**

v.

**CHANEY & SON GAS COMPANY, Appellee.**

**No. 4848.**

Court of Civil Appeals of Texas, Eastland.

Jan. 29, 1976.

Rehearing Denied Feb. 19, 1976.

Al Taylor, Nagle, Taylor & Ewing, Houston, Saul A. Pullman, Eastland, for appellants.

Bill Tippen, Abilene, Virgil T. Seaberry, Jr., Eastland, for appellee.

WALTER, Justice.

Debra Jean Lemaster, by and through her father, Ben H. Lemaster, as next friend, and Ben H. Lemaster, individually sued Chaney & Son Gas Company for damages resulting from a butane flash fire which occurred while Gayle Chaney, a co-owner of defendant, was filling a butane tank. The jury failed to find that Gayle Chaney was in any way negligent. Judgment was entered for defendant. Plaintiffs have appealed. We affirm.

Plaintiffs contend the jury findings are against the great and overwhelming weight and preponderance of the evidence so as to be manifestly unjust. Plaintiffs also complain of jury misconduct.

Gayle Chaney was requested to deliver butane to the Avinger residence. Upon arrival, he parked his truck, spoke briefly with Mrs. Avinger, hooked his delivery hoses to the tank, engaged the truck pump, and commenced to fill the tank. While the tank was filling, the safety relief or pop-off valve opened, "spewed" for a short period of time, and then closed. Some fifteen to twenty seconds later, the butane flashed. The butane tank was owned by the Avingers. The evidence indicates the gas was ignited from either a hot water heater or electric water pump located in a closet built on the side of the Avinger house.

In Special Issue 1, the jury failed to find that Gayle Chaney's failure to watch the liquid gallon meter on the truck as he was pumping the butane into the Avinger tank was negligent. The jury in Special Issue 3 failed to find that Chaney's action in overfilling (in gallons) the Avinger tank was negligent.

In considering great weight and preponderance points, we are to consider the entire record. In Re *King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Chaney's truck was equipped with a gallon meter. He did not watch the meter while filling the tank. Herbert Shilstone, Jr., a registered professional engineer, who had extensive experience in testing devices and materials to determine the cause of accidents, testified that when dealing with hazardous material the prudent and safe thing to do is to look at the meter on the truck in conjunction with looking at the percent gauge on the tank, to prevent overfilling the tank. Harry Thomas, an expert witness, testified the normal operator goes by his truck meter as well as the gauge on the tank. Gayle Chaney testified there was no regulation or requirement that a delivery truck be equipped with a gallon meter. Furthermore, he stated that to position the truck in order to read the gallon meter on the truck would require the truck to face the butane tank and place the engine of the truck in close proximity to the tank which would create a special hazard. Mr. C. B. Chaney, who had 26 years experience in the butane business, stated the Texas Railroad Commission rules and regulations require an operator to stand by and watch the gauge on the tank at all times. He stated they seldom ever use the gallon meter on the trucks.

The jury could reasonably conclude from the evidence the tank was overfilled and this resulted from a defective percentage float gauge even though Mrs. Avinger testified she had never had trouble with the tank. There is testimony that an acceptable practice is to watch the float percentage gauge on the tank when filling the tank. Gayle Chaney testified he intended to stop the pump when the percent gauge indicated the tank was 90% full. This is an acceptable limit. He observed nothing unusual about the way the gauge advanced before the trouble started. He testified the pop-off valve popped when the tank gauge was indicating 85%. There is evidence that after the fire, the percent gauge showed 80%.

We hold the findings of the jury to Special Issues 1 and 3 are not against the great weight and preponderance of the evidence.

The jury failed to find in Special Issues 5 and 7 that Chaney was negligent in not giving a warning of danger during the time the pop-off valve was spewing nor during the time after the pop-off valve had closed and before the butane caught fire.

Mrs. Avinger testified that when the truck arrived, she told all of the children playing in the back to go to "the front yard, now, and they all went." At this time, Debbie Lemaster was inside the house. When the tank made a "real loud pop noise," some of the children came running to the back yard with their hands over their ears. Mrs. Avinger then said, "You children get in the house." At that time, Debbie "was standing there holding the screen door open for the children to go in the house." At this time, the tank was making a "spewing sound." The door Debbie was standing in at the back of the house was 20 feet and 3 inches from the butane tank. Mrs. Avinger testified Debbie could have easily heard her tell the other children to get in the house.

Debbie Lemaster testified that she heard a popping noise and went to the back door. She was at the back door when the children came into the house. She testified about two minutes passed from the time the pop occurred until the fire occurred.

Gayle Chaney testified that when he arrived on the premises, several children were playing in the yard and he was going to tell them to get back, but before he could, Mrs. Avinger told them to get back and go to the front yard. He stated that from the time the tank stopped spewing until the explosion occurred was 15 or 20 seconds. Chaney testified that during the time the gas was spewing, he was busy trying to remedy any possibilities of fire. He said that he heard the children holler and run when the pop-off valve released and he had no idea they had come back into the vicinity. He stated that while the tank was spewing, "I didn't even see them. I don't know where they was. They left." At that time, he stated,

"They were gone, as far as I could tell. I was busy." When the pop-off valve released and spewing started, Chaney turned off the valve at the end of the delivery hose, went to his truck, turned off the engine and the main cut-off valve. He picked up a brass hammer, returned to the tank, and tapped the pop-off valve about four times. The valve then closed and the spewing stopped. After the spewing stopped, Chaney admitted there was a tremendous danger of fire if the gas reached an ignition source. Chaney did not know the hot water heater or pump were located in the outside closet. When asked if he at that time warned anybody to stay away, he said, "As far as I knew, there was nobody there, and like I say, my back was to the house." When asked if he looked to see if anybody was around when he started to remove the hose, Chaney said:

"A. I didn't look for nobody . . . in other words, I didn't see nobody and it was a pretty small area, so if they'd been there, I probably would have seen them. But now, as far as going and looking for nobody, no.

Q. All right, that's what I meant. Did you glance around to see if anybody was in the immediate area of the tank?

A. I could see in the immediate area of the tank. I guess you might say yes, I guess I did, because I could see in the immediate area.

Q. All right, did you see anybody?

A. No."

At another point, when asked if he issued a warning during the spewing, Chaney testified, "There wasn't nobody there at that period of time when it was popping off. They had all run." As to why he failed to give a warning after it stopped spewing and before the flash fire occurred, he said, "No, I didn't know there was anybody left there but me." He stated further, "The only thing I didn't understand is why they even came back in that short period of time, and I didn't realize they did or I would have

shouted a warning or hollered or something." In Chaney's deposition, he stated that after the spewing stopped everything seemed to be all right and any danger had apparently passed.

Herbert Shilstone, Jr., in answer to a hypothetical question, stated in his opinion a warning should have been given during the time the pop-off valve was open and after it closed before the flash.

The jury could have certainly concluded from the evidence that Chaney was negligent in not giving a warning. However, from the peculiar facts of the case, the jury could have reasonably failed to find Chaney was negligent in not giving a warning. He heard Mrs. Avinger tell the children to leave the back yard. Chaney was confronted with an emergency situation. There is evidence he saw no people in the area and he thought all had left the area around the tank.

The jury's findings to Special Issues 5 and 7 are not against the great weight and preponderance of the evidence.

■ Plaintiffs next assert jury misconduct. Four jurors testified and each said the word "insurance" was mentioned. The testimony of the jurors, however, shows only a casual mention of insurance and when it was brought up, the members of the jury were quickly admonished that it was not to be considered. We hold that plaintiffs have failed to prove that injury probably resulted. *Putnam v. Lazarus,* 156 Tex. 154, 293 S.W.2d 493 (1956).

We have considered all of the plaintiffs' points and find no merit in them. They are overruled.

The judgment is affirmed.

McCLOUD, Chief Justice (dissenting):

I dissent. Plaintiffs proved an overt act of material jury misconduct which resulted in probable injury.

Juror Bledsoe testified that while they were discussing the issues covering the con-

duct of Gayle Chaney, he overheard someone say that Chaney did not have any insurance. He said he thought it was Juror Housh who made the statement. He said that up to that point, Housh had done a good bit of talking on the questions. Bledsoe stated it seemed to him there was more than one reference made about insurance and such references were made at "the early part of the time we was in there" while they were discussing the questions about Gayle Chaney's conduct. He stated, that while the jury was in the jury room, "it was discussed in there, on the insurance, and they thought he was going to have to pay, and things like that." He testified that following the statement made by Housh regarding insurance one of the men said, "Well, we wasn't supposed to consider that." He said Juror Anderson stated, "that if the Chaneys didn't have any insurance, they ought to have."

Juror Bryant stated, "One time the word 'insurance' was brought up, and somebody, I don't remember who, said we weren't supposed to consider it, the fact that there might be insurance. I don't remember who it was or anything about it, really, I just remember that it was brought up."

Juror Swift testified she remembered only that the word "insurance" was mentioned on one or more occasions, and that each time it was mentioned somebody said it was not proper to consider it.

Juror Anderson testified that during the time the jury was considering Special Issues 1, 3, 5, and 7, somebody, probably Housh, said, "that they didn't think they had insurance." Anderson stated he thought he responded by saying, "Why, I'm sure he had insurance." He said insurance was mentioned probably two or three times. On cross-examination, Anderson testified that when insurance was mentioned, admonitions were given that insurance was not to be considered, and that would stop the discussion of insurance.

It is improper to disclose that a defendant does or does not have liability insurance.

*Rojas v. Vuocolo,* 142 Tex. 152, 177 S.W.2d 962 (1944). The size of the verdict is a proper matter for consideration in determining the issue of probable injury. *Great Western Inv. Co. v. Scott,* 254 S.W.2d 411 (Tex.Civ.App.—San Antonio, 1952, writ ref. n. r. e.); *Eichelberger v. Rankin,* 278 S.W.2d 278 (Tex.Civ.App.—San Antonio 1955, writ ref. n. r. e.); Pope, Jury Misconduct and Harm, XII Baylor L.Rev. 355 (1960). The jury in the instant case answered "O" to all damage issues.

Debra Jean Lemaster received extensive burns over 45% of her body. She was hospitalized in the Fort Worth Children's Hospital for 102 days, where she incurred a $13,776.50 hospital bill. The bill of the plastic surgeon was $6,915.00. The liability issues were close and highly controverted. The injuries were severe, yet the jury answered "O" to all damage issues. In my opinion, plaintiffs have shown probable injury. Rule 327, T.R.C.P.; *Barrington v. Duncan,* 140 Tex. 510, 169 S.W.2d 462 (1943).

I would reverse and remand the cause.